UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD PIECZYNSKI,

    Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

    Defendant.
                                        /

File No. 1:09-CV-875

HON. ROBERT HOLMES BELL

## **OPINION**

Plaintiff Ronald Pieczynski filed this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., to recover long-term disability benefits under an employee benefit plan issued by Defendant Hartford Life and Accident Insurance Company. This matter is before the Court on Defendant's motion for entry of judgment and Plaintiff's brief on the administrative record. (Dkt. Nos. 21, 22.) For the reasons that follow, Defendant's motion will be granted.

### I. Background

Plaintiff was employed as a Machine Operator by Centron Data Services, Inc. ("Centron"), in Muskegon, Michigan, until March 2, 2003, when he began experiencing lower back and leg pain. Because he was unable to return to work, Plaintiff applied for benefits under Centron's disability insurance policy (the "Policy").

The Policy provides two standards for eligibility for benefits. For the first twenty-four months of the benefits period, the beneficiary satisfies the definition of "disabled" if he or she is prevented from performing "one or more of the Essential Duties of *Your* Occupation . . . ." (R. at 32.) (emphasis added). After the first twenty-four months, the beneficiary is "disabled" within the meaning of the Policy if he or she is incapable of performing "the Essential Duties of *Any* Occupation." (*Id.*) (emphasis added). An "Essential Duty" is one that:

1. is substantial, not incidental;
2. is fundamental or inherent to the occupation;
3. can not be reasonably omitted or changed.

(*Id.*) "To be at work for the number of hours in [the employee's] regularly scheduled workweek is also an Essential Duty." (*Id.*) "Any Occupation" means

> an occupation for which [the beneficiary is] qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of [the beneficiary's] Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

(*Id.* at 31.)

After Plaintiff applied for disability benefits in 2003, Defendant determined that Plaintiff was disabled under the "your occupation" standard. In 2005, Defendant sought additional information from Plaintiff to determine his continuing eligibility for benefits under the "any occupation" standard. After receiving additional information from Plaintiff and conducting its own review, Defendant determined that Plaintiff did not qualify for benefits under this standard, and it terminated Plaintiff's disability benefits as of October 31, 2008.

(R. at 321.) Plaintiff appealed that decision and it was affirmed by Defendant's appeals unit on August 11, 2009. (*Id.* at 552.) Plaintiff now requests review of that decision before this Court.

Plaintiff contends that he "suffers from a congenital condition and degenerative disc disease that has continually resulted in severe, debilitating back pain, plus radiculopathy pain, weakness and numbness into his legs." (Dkt. No. 21, Pl.'s Br. 5.) In his initial application for benefits in 2003, Plaintiff indicated that he stopped working because of "[p]ain in back, trouble bending over." (R. at 158.) His occupation involved the operation of an inserting machine as well as frequent lifting and carrying of thirty pound boxes of paper. (*Id.* at 159.) Plaintiff complained that his condition made him "unable to walk - lift - bend or twist." (*Id.* at 161.)

Plaintiff underwent an MRI on March 10, 2003. (R. at 144.) Reviewing the MRI, Dr. Shelly Williams noted a "congenitally slender spinal canal" and "very minimal disc bulges involving the lower two lumbar levels." (*Id.* at 144-45.) However, Dr. Williams noted that Plaintiff's "complaints seem out of proportion to the MRI findings." (*Id.* at 951.) Dr. Williams took Plaintiff off of work until the beginning of April, and referred him to Dr. Mark Moulton, an orthopaedic specialist. (*Id.*)

After an office visit on April 8, 2003, Dr. Moulton noted that Plaintiff reported back and leg pain that is "severe," "progressive," and "constant in nature." (R. at 143.) According to Dr. Moulton, Plaintiff reported that his pain "is increased with activities," specifically

3

"twisting, bending, sitting, standing, and walking." (*Id.*) However, Dr. Moulton observed that Plaintiff "is able to ambulate throughout the room comfortably and perform heel/toe ambulation without difficulty." (*Id.* at 142.) Based, in part, on the findings from the MRI, Dr. Moulton diagnosed Plaintiff as having "congenital stenosis [with] mild spondylosis." (*Id.*) On Plaintiff's application for benefits, Dr. Moulton reported Plaintiff's limitations as "totally disabled next eval 6-24-03." (*Id.* at 165, 169.)

On May 1, 2003, Plaintiff received a nerve root injection to treat his symptoms. (R. at 146.) In a follow-up visit to Dr. Moulton, Plaintiff reported that he was "80% improved," but Dr. Moulton opined that surgery would likely be necessary if the injection did not offer long term relief. (*Id.* at 140.)

Following another office visit in June of 2003, Dr. Moulton noted that Plaintiff's relief had been short term. (*Id.*) Dr. Moulton recommended decompression and a second opinion regarding surgery. (*Id.* at 140-41.) He also noted that Plaintiff's tobacco habit would "accelerate his degenerative disc disease." (*Id.* at 141.) A note from June 24, 2003, indicates Dr. Moulton's opinion that Plaintiff is "totally disabled," and that he "may not return to work," subject to another evaluation scheduled for July 8, 2003. (*Id.* at 147.)

Defendant approved Plaintiff's application for benefits in July of 2003, but indicated that Plaintiff would be entitled to continued benefits after June 3, 2005, only if he met the "any occupation" standard for eligibility. (R. at 393-94.)

Plaintiff continued to see Dr. Moulton for treatment, and in August of 2003, Dr. Moulton noted that Plaintiff "is doing much better after his [nerve root] injection" but that his condition "may ultimately succumb to surgery however this is not a great option given someone with congenital stenosis." (*Id.* at 80.) However, in November of that year, Dr. Moulton noted that Plaintiff's "back pain is miserable" and that Dr. Moulton did "not think that a simple decompression is going to make him much better." (*Id.*)

In 2004, Plaintiff reported to Defendant that he was being treated by Dr. Wayne Kohn. According Dr. Kohn's notes from that time, Dr. Kohn prescribed medication for Plaintiff's condition, including Naprosyn and Vicodin. (*Id.* at 866-70.)

In 2005, as part of its continuing review, Defendant referred Plaintiff to an occupational therapist, Mr. Richard Carlson, to conduct a functional capacity evaluation. (R. at 793-805.) Mr. Carlson completed his assessment in April of that year following an interview with Plaintiff, review of medical reports, and an evaluation of findings from various tests of Plaintiff's strength, dexterity, fitness, and related abilities. (*Id.* at 797.) Mr. Carlson's report notes that Plaintiff "has significantly limited capacity to function in even a sedentary job situation. He is capable of sitting only for periods not to exceed 45 minutes." (*Id.* at 803.) Mr. Carlson opined that Plaintiff "would have considerable difficulty sustaining a job at the sedentary level over the course of an 8 hour day," though he "has the ability to perform tasks that call for him to alternate between sitting and standing for brief periods of time." (*Id.*) Mr. Carlson concluded that Plaintiff "is certainly able to do tasks that would be included in a

sedentary job, but due to his low back pain, he would not be able to sustain it over the course of an 8 hour day." (*Id.* at 804.)

In May of 2005, Defendant notified Plaintiff that he met the definition of disability in the Policy, but that Defendant would continue to request information from Plaintiff to evaluate his condition. (R. at 370.)

Dr. Kohn's notes from 2006 indicate that Plaintiff has "chronic pain due to spinal stenosis" and that Plaintiff uses Naprosyn which "works well for him" along with Vicodin. (*Id.* at 756.) Dr. Kohn recommended temporarily stopping use of the Naprosyn to alleviate Plaintiff's complaints of heartburn. (*Id.* at 757.) Dr. Kohn also noted that Plaintiff "wants a referal [sic] to pain management." (*Id.* at 756.)

In June of 2007, Plaintiff reported in a questionnaire that his limitations were: "cannot lift, bend, stoop, squat, walk for long periods, sit for long periods, very intense pain." (R. at 733.) The questionnaire also provided a list of six activities that Plaintiff was asked to rate in terms of his ability to perform them with or without assistance. (*Id.*) Plaintiff reported that he could perform all six tasks independently, without the use of assistive devices (*id.*), a small improvement over a similar report from 2004, in which he indicated that he could perform only five of these tasks without assistive devices (*id.* at 894).

To clarify the extent of Plaintiff's disability, Defendant hired an investigator to conduct video surveillance of Plaintiff in January and February of 2008. In one video taken by the investigator, Plaintiff can be seen shoveling deep snow around a vehicle parked in front of his

home. The video shows Plaintiff repeatedly scraping, scooping, lifting, carrying, and throwing shovels of snow with both hands, as well as stooping, and twisting his body. Plaintiff is seen shoveling snow for approximately fifty-five minutes, with a four minute break in the middle. In another video, Plaintiff can be seen walking down the stairs in front of his house without use of the railing, and walking slowly down a snow-covered street without assistance and without noticeable impairment.

The investigator visited Plaintiff at his home in June of 2008. When Plaintiff met him at the door, the investigator observed that Plaintiff walked "with a noticeable limp and grimaced with every step" and that he constantly shifted his weight while standing. (R. at 447.) Plaintiff reported to the investigator that he can lift eight to ten pounds, push light snow "until his back locks up," climb twelve stairs without difficulty, and sit for up to an hour as long as he is constantly moving in his chair. (*Id.* at 448.) Plaintiff gave a statement to the investigator in which he asserted that he has constant pain in his lower back, and tingling in both legs. (*Id.* at 449.) Plaintiff stated, in part:

> If I bend over I can not stand up. The pain is worse in the colder weather and once I hit the cold, I am locked up. I can not straighten back up. . . . I have days that I can not get out of bed and this occurs once a week. I do not have the energy to get up. . . . I have days (twice a week) that I am feeling pretty well and I am able to function with the pain like I used to.
>
> The specific duties that I am no longer able to do at any occupation are I can not stand, sit for a long period of time. I can not stoop, bend, kneel or twist because of my back pain. I can not lift more than 8 pounds. Normal walking causes my muscles to swell pinching my spine. This pinches my spinal cord which causes extreme pain.

> . . .
>
> There are no accommodations that can be made available to me that would allow me to return to work with my current medical condition. I can not lift, stoop, bend, sit or stand for a long time. I would have to be given time to sit and rest if stand to [sic] long - or allowed to stand if sit too long.

(R. at 504, 511.)

After viewing the videos, Plaintiff explained that the activities in the videos represent his "normal/average level of functionality during his daily activities," and that "he was not doing anything that he should not have been doing." (*Id.* at 446-47.) Plaintiff indicated that he "probably took his medications prior to shoveling." (*Id.* at 447.)

Dr. Kohn reviewed the videos in September of 2008, and noted that Plaintiff's movements were "slow and methodical" and that Plaintiff "seemed restricted in his ability to forward bend to a significant degree." (R. at 660.) Dr. Kohn noted that the functional capacity examiner and the private investigator both observed that Plaintiff is unable to sit for long periods of time. Thus, Dr. Kohn opined that "if this patient could maintain a consistent level of pain management he could certainly remain functional." (*Id.*) Dr. Kohn was uncertain about sustainability of Plaintiff's abilities over an eight hour shift, but favored "attempting a sedentary functional status with adequate pain control." (*Id.*) "[W]ithout pain control," Dr. Kohn did not think that Plaintiff "would be able to perform tasking in an 8 hour shift." (*Id.*)

In October of 2008, Dr. Howard Choi, Board Certified in Physical Medicine & Rehabilitation, conducted an independent review of the records for Plaintiff's case, including Plaintiff's medical records, Plaintiff's statements, and the investigator's video; Dr. Choi also

8

discussed Plaintiff's case with Dr. Kohn. (R. at 645.) According to Dr. Choi, Dr. Kohn reported that Plaintiff's "work status has been based primarily on [his] self-reported work capacity." (*Id.*) Dr. Kohn acknowledged that Plaintiff's activities from the video exceeded Plaintiff's self-reported limitations. Dr. Kohn reported that Plaintiff "could probably work in a sedentary occupation, although he had questions whether [Plaintiff] would be able to work in a sustained manner." (*Id.*) According to Dr. Choi, Dr. Kohn also thought that work would "probably be therapeutic" for Plaintiff. (*Id.*)

Dr. Choi discounted the findings from the functional capacity evaluation by Mr. Carlson, noting that those findings were based, in part, on self-imposed limitations, including Plaintiff's refusal to bend his spine and his apparent inability to walk on a treadmill at 1.0 mph. (R. at 647.) Dr. Choi also noted "discrepant findings" in the functional capacity exam, including the "3+ to 4- strength" findings that were "not corroborated by any medical examiner exam." (*Id.* at 645.) In Dr. Choi's opinion, there is "no clinical, organic basis to support [Plaintiff's] inability to walk on the treadmill at 1.0 mph," or to support "grades of 3+ to 4- out of five in the limbs on strength testing." (*Id.* at 647.) Dr. Choi noted that observation under surreptitious conditions, as in the surveillance video, is more likely to represent Plaintiff's true capacity level. (*Id.*)

Dr. Choi concluded that "there is no clinical basis for any limitations and/or restrictions with respect to lifting, carrying, bending, sitting, standing, walking, reaching, fine motor hand activities, performing repetitive hand or foot movements, or other work-related activities on

a full time basis," and that there is "no clinical rationale to support that the claimant would not be able to work full time in at least a sedentary physical demand level." (R. at 647.)

On October 31, 2008, Defendant determined that Plaintiff did not qualify as "disabled" under the "any occupation" standard in the policy. (*Id.* at 322, 324.) In doing so, Defendant relied upon evidence in the record that included the following:

- Video surveillance showing Plaintiff: "standing, walking, balancing, stooping, bending and twisting at the neck and waist," shoveling his driveway for approximately an hour, "repetitively scooping, lifting, pushing and pulling shovels full of snow," "throwing, digging, chopping and scooping snow with the shovel repetitively with both arms and hands," all of which were performed "independently, and without the use of visible aides." (R. at 325.)

- Dr. Kohn's opinion that Plaintiff is able to perform full time, sedentary work with adequate pain control, though Dr. Kohn was uncertain as to Plaintiff's capacity to sustain such activities. (*Id.* at 325-26.)

- Dr. Kohn's report that Plaintiff's "work status has been based primarily upon [Plaintiff's] own reported capacity." (*Id.* at 326.)

- The independent review by Dr. Choi, who concluded that "there is no clinical rational [sic] to support that [Plaintiff] could not work full time in a sedentary level position." (*Id.*)

- Inconsistencies between the video surveillance and Plaintiff's reported limitations on activity. (*Id.*)Plaintiff appealed Defendant's decision to deny him further benefits. As part of its review, Defendant's appeals unit obtained the opinions of two additional physicians. Dr. James H. Bress, Board Certified in Internal Medicine, reviewed Plaintiff's medical file and concluded there "is no evidence that the claimant has a medical condition, which would restrict full-time light occupation, with frequent sit, stand, walk, occasional bend, crouch, stoop, kneel, and maximum lifting of 20 pounds." (R. at 540.) In Dr. Bress's opinion, Plaintiff is capable of full-time light work. (*Id.*)

Dr. Melvyn Lurie, Board Certified in Psychiatry, reviewed Plaintiff's file related to his reported psychological symptoms of depression and lack of motivation. Dr. Lurie discussed Plaintiff's case with Dr. Kohn, who reported to Dr. Lurie that Plaintiff had "an agenda to obtain and maintain disability insurance" and that Plaintiff was "'probably malingering.'" (*Id.* at 546.) According to Dr. Lurie, Dr. Kohn indicated that, "overall, if [Plaintiff] were motivated to work, he could work." (*Id.*) Dr. Lurie concluded that there were no restrictions or limitations with respect to Plaintiff's psychiatric functioning. (*Id.* at 547.)

Based on all of the foregoing, Defendant's appeals unit affirmed the decision to deny further disability benefits. (*Id.* at 552, 559.)

## II. Analysis

ERISA allows the beneficiary of an employee benefit plan to bring a civil action to

recover benefits due, or to enforce his rights, under the terms of the plan. 29 U.S.C.§ 1132(a)(1)(B). Where the benefit plan grants the plan administrator discretionary authority to interpret the terms of the plan and to determine eligibility for benefits, the Court reviews the plan administrator's decision to deny benefits under the deferential "arbitrary and capricious" standard of review. *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010). The parties agree that the arbitrary and capricious standard applies in this matter. "Under the arbitrary-and-capricious standard, [the Court] will uphold a plan administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Balmert*, 601 F.3d at 501 (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)). However, "'the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions.'" *Id.* (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir.2005)). Plaintiff bears the burden of proving his disability. *See Rose v. Hartford Fin. Servs. Group, Inc.*, 268 F. App'x 444, 452 (6th Cir. 2008).

The strongest evidence in favor of Plaintiff's eligibility for benefits is the opinion of Mr. Carlson regarding Plaintiff's functional capacity. However, Dr. Choi provided a reasoned basis for discounting this evaluation in light of the "discrepant findings" in the report and the evidence from the video surveillance. Notwithstanding Mr. Carlson's opinion, the opinions of Drs. Choi, Bress, and Lurie, combined with the video evidence and the statements by Dr. Kohn, constitute substantial evidence in support of Defendant's determination that Mr.

Carlson's evaluation, and Plaintiff's statements, do not accurately reflect Plaintiff's limitations. *See McDonald v. W.-So. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) ("Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious . . . .").

Plaintiff contends that Defendant's decision was arbitrary and capricious because Defendant initially determined that Plaintiff was eligible for benefits and because his condition has not changed, citing *McDonald*, a case in which the Sixth Circuit affirmed the district court's finding that the defendant's denial of benefits was arbitrary and capricious. 347 F.3d at 172-73. The defendant in that case had relied upon two reports by one doctor in the face of the plaintiff's "overwhelming evidence" to the contrary. *Id.* at 170-71. In support of his claim for disability benefits, the plaintiff offered the unequivocal opinions of two doctors that he was unable to return to work. *Id.* at 169. In addition, two independent examiners questioned the plaintiff's ability to return to work. *Id.* at 170. The Sixth Circuit held that the district court properly discounted the first report relied upon by the defendant because it was ambiguous and because it merely opined that the plaintiff "might be able to return to work under certain limited circumstances." *Id.* The second report offered a much more forceful conclusion regarding the plaintiff's inability to return to work, suggesting that the plaintiff might be malingering; however, the Sixth Circuit held that the district court properly discounted the second report because there was no justification for the doctor's change in opinion other than a telephone contact with the defendant. *Id.*

*McDonald* is distinguishable from this case. In *McDonald*, the defendant's consultant changed his opinion without additional evidence to support the change. In contrast, Defendant relied upon new evidence of Plaintiff's condition when it made its revised benefits determination, particularly the video surveillance showing Plaintiff performing activities at a level inconsistent with his reported limitations, and the statements from Plaintiff's treating physician, Dr. Kohn. Defendant's initial decision to provide benefits did not, in itself, obligate Defendant to continue to provide benefits in the future. *Cf. Rose v. Hartford Fin. Servs. Group, Inc.*, 268 F. App'x 444, 454 (6th Cir. 2008) (holding that the claimant in that case was not entitled to indefinite payment of benefits upon the administrator's initial determination that she was entitled to them). Defendant was entitled continue to evaluate Plaintiff's condition based on the new evidence that it received.

*McDonald* is also distinguishable because the district court in that case discounted the evidence relied on by the defendant. *McDonald*, 347 F.3d at 170-72. In contrast, there is substantial evidence in the record on which Defendant could properly rely for its determination that Plaintiff is not disabled under the terms of the Policy. Drs. Choi, Lurie, and Bress all concluded after review of Plaintiff's file that Plaintiff would be able to work full time in a sedentary capacity. To the extent Dr. Kohn's opinion diverges from the opinions of these other doctors, it merely indicates that Plaintiff's functional capacity depends upon Plaintiff's ability to maintain adequate pain control. But Dr. Kohn acknowledged that Plaintiff's activity in the surveillance videos represented the level of activity Plaintiff could

14

achieve with adequate pain control, and he indicated that Plaintiff might be able to work a full week with adequate pain control. Plaintiff's own statements that his activities in the video represent his normal/average level of activity, and that he had probably taken his medications before shoveling, are consistent with this conclusion.[1]

Plaintiff asserts that he suffers from a condition that will generally progress with time. However, the progressive nature of his condition does not necessarily mean that he is unable to perform the essential duties of a sedentary occupation, or that he is otherwise disabled under the terms of the Policy. Even if Plaintiff's underlying medical condition has not changed since Defendant made its initial benefits determination, the evidence gathered by Defendant after that decision sheds new light on Plaintiff's functional limitations as a result of his condition; Defendant was entitled to take this evidence into account when determining whether Plaintiff continued to qualify for benefits.

Plaintiff also contends that none of his physicians (Dr. Williams, Dr. Moulton, Dr. Eyke, or Dr. Kohn) questioned or doubted his credibility, and that Mr. Carlson agreed with the opinions of these physicians. However, Dr. Kohn and Dr. Williams both expressed doubts about Plaintiff's credibility. Dr. Williams noted that Plaintiff's symptoms seemed out of proportion to the findings in the MRI. (R. at 951.) According to Dr. Lurie, Dr. Kohn reported

---

[1]The record also suggests that Plaintiff was at least partially responsible for failing to maintain pain control. In his office notes from December of 2007, Dr. Kohn noted that he "discussed mostly pain control with [Plaintiff] and asked him to use his pain medicine every day 2-3 times a day to stay ahead of the pain as I think he has been too reactive rather than proactive." (R. at 675.)

that Plaintiff had an agenda "to obtain and maintain disability insurance" and was "'probably malingering.'" (*Id.* at 546.)

In sum, Defendant relied upon the opinions of three medical examiners that Plaintiff is capable of working full time in a sedentary capacity, as well as video evidence contradicting Plaintiff's reported limitations, in the face of a discounted functional capacity evaluation and equivocal statements by Plaintiff's treating physician, Dr. Kohn, regarding Plaintiff's ability to work full time in a sedentary capacity. Considering the whole record, it was not arbitrary and capricious for Defendant to conclude that Plaintiff is not disabled under the terms of the Policy.

For the foregoing reasons, therefore, the Court will affirm Defendant's decision to terminate Plaintiff's disability benefits and will award judgment in favor of Defendant. Plaintiff also requests an award of attorney's fees, contending that Defendant terminated Plaintiff's benefits in bad faith. (Dkt. No. 21, at 6.) However, because the Court finds that Defendant's decision was not arbitrary and capricious, Plaintiff's request will be denied.

An order and judgment will be entered that is consistent with this opinion.


Dated: June 10, 2010                    /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        UNITED STATES DISTRICT JUDGE